Engelmeyer, counsel, greetings. My colleagues, Ms. Tabry and Mr. Marshall and I represent Isis Naguib. We're here asking the court to overturn the lower court's grant of summary judgment due to errors of law. I will focus on four of them. First, the lower court misapplied the doctrine of honest belief, blindly adopting Millennium's assertion, including hearsay, about what they said was their honest belief, without requiring any independent corroboration, without requiring any assertion of whether it was in good faith. Second, the lower court turned on its head causation law and found that essentially temporal proximity was part of the prima facie case. Third, the lower court construed adverse action much too narrowly for a state law, Minnesota Whistleblower Act, and Minnesota Human Rights Act claim, losing the forest through the trees. And fourth, the court construes facts in favor of Millennium without considering the fact of the submissions by Naguib, including two recanted affidavits declarations. Let's start with honest belief. In the summary judgment memo, Millennium states Naguib was fired for blatantly violating wage and hour laws, cheating housekeepers to line her own pocket. They said she created her form and she directed housekeepers to underreport their end time so that she could increase her own bonus. Well, guess what happened in response to summary judgment? Two of those three persons who said that Ms. Naguib discouraged them recanted their declarations when they were provided assistance from an interpreter to do their declarations submitted by Ms. Naguib. And the former HR person that said, this is not Naguib's form. This is our form. We specifically directed her to use the sign in sign out sheet. And she was doing for 10 years exactly as she was instructed. In fact, the form she used that HR director said was authorized by her and Millennium. So in the reply brief, what happens? Now that Millennium sees, oops, it's not indisputable. Oops, it's not undisputed. In fact, now they claim, they throw in in the reply brief, oh, it was our honest belief, relying on Alvarez. But Alvarez has no applicability here because in Alvarez, the employer argued honest belief in its moving papers. So the employee had a chance to respond in its responsive papers to argue good faith, to submit evidence that it really wasn't a good faith, honest belief. Naguib never got that opportunity. Instead, the issue of honest belief was never squarely before the court was first raised in reply. We asked this court not to countenance that aberration and not to allow good faith belief to be used as an excuse when you're stated indisputable, legitimate, non-discriminatory reason doesn't hold water. Let's talk about even though the issue wasn't squarely before the court, we know that there's evidence in the record that shows this was not a good faith belief. 10 years of the same practice, others doing the same practice that Naguib did. And let's talk about this shocking recovery that was supposedly made. Remember, Naguib gets kicked out on vacation on the 21st of October. After on the 20th of October, she said, I will forfeit my vacation. But nonetheless, they kick her out and go shockingly discover this wage and hour violation that's been going on for 10 years. Look at what Simmons did there. On the 27th, he's been in this position for six days digging through her work area and he says that the housekeeping department is working excellent. He says that there's some minor opportunities for improvement. But what happens the next day? The next day, HR comes and meets with Simmons, the same HR to whom Naguib had complained for years about illegal treatment. And by 9.55 the following day, he followed the direction. HR told Simmons, dig deeper. And in response, Simmons found people, quote, willing to speak to HR about Naguib. This is not an honest belief. This is not good faith. This is a dirt digging retaliatory investigation. And it's based on hearsay. All of what Simmons said is based on what an assistant manager allegedly told him that Naguib and the housekeepers were speaking about. Well, that assistant manager, like the other two who recanted their affidavits, said that is not true. What Simmons submitted as hearsay is not true. That was in the submissions and the courts totally disregarded it. In fact, their own investigation that's set forth in the supplemental appendix submitted by the in the investigation they did into this supposed shocking investigation they came upon in October. The same person didn't question everyone. The same person didn't ask the same questions. The same questions weren't even asked. Ms. Naguib never had the chance to deny that she was doing anything wrong and she was following direction. They found that out in this lawsuit. The second and third errors by the lower court, misused temporal proximity as a weapon and adverse employment action analyses to narrow the framework. Let's talk, judges, about what we have here. We have a 41-year employee. That is a long time. For the last three years of her employment from November on my thumb to November of 11 on my thumb to November of 14 on my pinky, she complained multiple, multiple and experienced a lot of bad stuff. Even if you only consider what's in my hand, that is temporally proximate in a 41-year employee's history. That is a small amount of time. What the court also failed to acknowledge and used the law to eviscerate is this time period that's at issue. It was not a couple of single, discrete incidents. It was a lot of different coming together so that the totality of the circumstances should have been considered. But what did the lower court do? She sliced through the facts and pulled out everything that wasn't adverse employment action enough for her. Defining adverse employment action as that which is a termination, that which is a reduction in pay or that which is a removal of vacation. But that's not what the whistleblower law says and that's not what the Minnesota Human Rights Act said. The whistleblower act says it's that which dissuades an ordinary person. So not only did the court slice through the facts once to pull out everything that wasn't adverse employment action enough for her, she sliced through it again to pull out everything that wasn't two months apart. If it wasn't two months apart, which the court said was the noted temporal proximity, she simply discarded it. Doing it in that way fails to acknowledge that this was a pattern of events, a totality of circumstance, because you have lots of temporal proximity in there between my pinky and my thumb. Starting in November of 2011, when she refuses to testify falsely, by January of 2012, she is being nitpicked. This continues until her termination. Her last complaint is six days before she's terminated. In November 13th of 2014, when she's terminated on November 19th of 2014. And what do we have in here? The very first most egregious fact that the court ignored is the lawyer yelling. So she originally says, I'm not going to lie. She's told we don't use the Freeman standards. She testifies, yes we do. Then in March, a lawyer calls her up and says this, there are no Freeman standards. She testified he's yelling. So I'm obviously not anywhere near as loud. What do you want me? Who do you want me to talk to? Do you want me to call the president of the company and tell you there are no Freeman standards? Lawyer yelling dissuades employees. Nitpicking dissuades employees. Those weren't the only things though. They told her you're going to be laid off during the renovation. The renovation that was caused by her testimony, the 23 million dollars that had to be spent on fixing up the hotel because they didn't follow the Freeman standards. They also, the court admitted one adverse employment action was that for every day she worked, she had to take, every four days she worked, she had to take a fifth day of vacation. Well, there's a lot of other things that happened in that window of time between December of 2012 and April of 2013 when this renovation is going on. Have there been any other prior renovations? Have there been any other prior large-scale renovations of the hotel prior to that one? That's not in the record, your honor. There's none in the record that I'm aware of. Certainly not a 23 million dollar renovation. But had there ever been any occasions where the company felt it was necessary to not have her on the premises? Not in 41 years, your honor. That's in the record. And the other thing that's in the record is every single executive committee member was there. Even the brand spanking new front desk person. You aren't going to have any guests during renovation. But the front desk person was allowed to do executive work. You know what Ms. Nagib was forced to do? Folding, cleaning, counting towels. Then when they were trying to set her up to fail during that time. And when she didn't fail in April of 2013, what happens is, so we have Rivers, who's the guy who directed her to say we have no Freeman standards. Rivers gets promoted from her boss to a bigger position. He then writes an email in April of 2013, when they haven't been able to force her to fail, to the director of renovations and says, hey, I want to inquire whether my replacement is taking control of especially and model. The two people who testified, the hotel used the Freeman standards that resulted in a $23 million settlement to fix the things that should have been done in the right way. And did that taking control happen? By the end of 2013, Neufeld, her new manager, was microscopically inspecting her work. Watching employees in the linen room. Watching employees in the locker room. Watching her employees in the laundry. And no one else's employees. Watching people punch time clocks. The record is undisputed that Neufeld watched time clocks for a long time. And you know what she did? She sent a memo in October of 2013 saying, hey, I noticed people are checking out after they've changed into their street clothes. And they're checking in before they change into their other clothes. So essentially, Neufeld is directing the plaintiff to watch to make sure that the time records are accurate. So when the plaintiff asks people to sign on the sign-in sheet when you've stopped working and uses that as the payroll, that is not a scheme to defraud. That is doing exactly what she was told. On top of that, they essentially force her out on vacation, do this investigation when she's gone. And the investigation itself is inconsistent. It's arbitrary. She is not asked questions in the way others are. I see I'm into my rebuttal time. And for those reasons, there's ample evidence of adverse employment action. Thank you, Ms. Inglemeyer. Mr. Martin? Good morning, Your Honor, Counsel. I'm Pat Martin. And with me today is Stephanie Willing from the law firm of Ogletree Deacons. And we're here on behalf of Millennium Hotel, and we seek affirmance on all six of plaintiff Nagib's employment law claims. Now, the district court got to summary judgment in multiple and correct and overlapping ways. But in the fall of 2014, Millennium discovered undisputed evidence that the director of housekeeping in Minneapolis was willfully violating federal wage and hour law by cheating housekeepers out of their time worked. Now, the main premise of Nagib's case throughout this has been that she is a whistleblower under the Minnesota Whistleblower Act because in 2011, she supposedly refused instructions from her prior manager, Robert Rivers, to testify falsely relating to hotel renovation issues. And so they repeatedly call Rivers a driving force in the November 2014 termination because they need to tie Rivers from that 2011 event to the 2014 termination for causation purposes three years later. But it's a complete fiction, Your Honor, based on zero evidence. As Rivers was not a decision maker in 2014, he left the hotel, went to Boston in early 2013, 19 months before this termination, and he basically disappears from this case. He has no bearing and had absolutely nothing to do with that termination. And you have three new people who end up becoming the decision makers on this termination. And of course, they ultimately never deposed Mr. Rivers. So if we focus on the undisputed facts in front of Millennium when it fired her, Ms. Nagib, in 2014, we have three valid sources showing blatant wage and hour violations involving 178 time punch changes directed by Nagib. Those include Simmons' discovery on this. Now, he testified he was given no instructions. He task-forced at this hotel and others previously. He went in. He noticed things about the department. We have the Daggett investigation covering housekeeping and all other departments. The company went in and they pulled everything apart to see what is happening where as it relates to time punches. And then you have the Crane interview of Ms. Nagib, which was the chance for her to tell her story. And when she has that opportunity to tell her story, the only reason she can say for why she changed time punches 178 times is that these people didn't know military time. What that has to do with punching out when your work is done, I really don't know. But fundamentally, Ms. Nagib has... What about the affidavits that Appellant says were recanted? Does that have any impact on... It doesn't. And they were actually considered by the court. You know, they were people saying that I don't think I got cheated. But of course, they don't know that that clock is being backed up. And if I could direct your honors to, I think it's essay three, my supplemental appendix. It shows Nagib repeatedly changing time punches for Alyse Adekpi eight times totaling over 100 minutes, where she punches out at 426. And her time is written back to four o'clock. And she's just one of 46 housekeepers who were impacted and who the company, showing it's good faith and honest belief here, ended up writing out checks to all of these people to mitigate the risks that had been created by Ms. Nagib. So she's just one of 46. But if you look at that document, you'll see Nagib changing time punches. And you'll see the amount of time it being 1626 is one of the times backed up to 1600. So she still has no answer for her own sworn testimony and undisputed evidence that came out of her own mouth at her deposition. Now in her reply brief, Nagib tries to undermine her own deposition admissions by claiming she's Egyptian immigrant whose second language is English. So essentially they say that we're not allowed to rely on the summary judgment admissions where she repeatedly agreed with facts that showed that she was violating federal law. But she was a senior manager in this hotel for 40 years. She spoke fluent English. She didn't have any problems with the deposition questions when I was getting admissions from her. And now one of their main arguments in their reply is that we need to undo the dispositive deposition admissions because English is her second language. Absolutely, the court should be able to use the deposition admissions and take them at face value at summary judgment. The critical inquiry on the various claims, and there's six of them, so it's hard for me to jump through all of the evidence. And there's never really been a cogent list of what all of the protected categories are and how they string together, whether it's a Minnesota Human Rights Act claim or a Minnesota Whistleblower Act claim. But if we look at the information that was before the employer at the time and what they honestly believed, the company had those three sources. David Simmons coming in, he observed firsthand. He doesn't need hearsay. He observed firsthand, housekeepers come in, they would punch out at 4.15, 4.30, and then they would go over on the sheet and write down 4 o'clock. And he'd say, why are you doing that? And they said, well, we can't have overtime. So that was very concerning. He literally stood by the time clock when they were coming in, and they were putting the wrong time down on the sheet after punching out at 4.15, 4.20. So then he reports that to senior management, and he sort of disappears. The company then does that investigation across all departments, and they find some minor violations in other departments. They find that she's using this form, and sure, an HR person said, yeah, she's used that form for a while. She testified that she drafted that form. And if you actually look at the depositions, HR, the new HR, gave her a new form that was compliant so that when people signed it, they understood that their time would be backed up. It would be employees who approve time punch changes. That was the form that HR gave. She says she still had permission to use this form. But let me be perfectly clear on that form. There is nothing, there is no evidence that anybody said that you could use this form to back people's time up, to take away time that they had actually worked. And that's what was actually happening here. You had people who didn't get their rooms cleaned until 4.15, 4.20. They come down, they punch out, and then she's going in 178 times and moving their time back to 4 o'clock. That's blatant wage and hour violations, and that's something for which the company could get sued and had legitimate concerns about that, and that's why they issued all those checks. So that's the information that was before the employers. And then we have that Janice Crane interview, as I said, where Ms. Crane came in, another outsider from one of the Millennium Hotel in Chicago, she came in. Ms. Nagib secretly recorded that tape recording, and it's very clear that she is given the opportunity to explain why she is changing all of these time punches, and her only excuse is that the housekeepers don't know military time. What that has to do with anything, I really don't know. And we also have them growing out of those 46 checks that were issued. We also have discipline being meted out against the folks in other departments who had some minor violations. There were, I think, 40 or 50 in all the other departments, but there were 178 with Ms. Nagib. And Ms. Nagib was the only one who had a payroll bonus. She testified that having her bonus linked to payroll was unfair because it was very tough to get. And so she had a basis to want to cheat these housekeepers out of their extra time. So if we look at the six legal claims, you essentially have a lawsuit that says, you know, I was termed in 2014 for being a whistleblower based on something in 2011. And if you don't believe that, I was terminated for my age. And if you don't believe that, it was because I went out on FMLA leave. And if you don't believe that, I have these other retaliation claims. The district court dismissed Nagib's six claims for several reasons, including no direct evidence, MHRA preemption, limited adverse action, no causation, and no pretext. And given these dispositive failures, the court also declined to rule on questionable protected conduct and also statute of limitations failures because we have two statute of limitations that work here. One being under the Minnesota Whistleblower Act, which for refusal claims, as the Supreme Court hinted at in the Ford case, there's both refusal and opposition claims. But the opposition claims are six years, but the Whistleblower Act claims here are the refusal to testify falsely in 2011. So that should have a two-year statute of limitations. And certainly, the Minnesota Human Rights Act has a one-year statute of limitations. I could go through why there's no direct evidence here, but I'll skip ahead to... Could you speak to this question of adverse action and what the proper standard is? We have this amicus brief that talks about the Minnesota standard being different from federal standard and the oral argument that they argued that the judge defined it too narrowly. The court... I'm sorry. The court actually... Go ahead. No, I started too early, Your Honor. I apologize. The court actually... The district court cited Burlington, which cites the same standard about for adverse action of dissuading a reasonable worker from making a discrimination claim. So Burlington, in other cases, also still say that petty slights and minor annoyances are insufficient. At the hearing on the summary judgment, one of their main adverse actions claimed was that she had to fold towels. This manager of the housekeeper department, during the renovation, was forced to do menial work of folding towels, and therefore, that is their job, theoretically. We talked about that. There were issues relating to... Somebody didn't wear a hard hat, but she was the only one forced to do it. So there were a series of things that she claimed to be adverse actions. One of the things she claimed that was adverse action was that the company hired a couple of illegal immigrants, and that that was done to retaliate against her. And that was adverse action. Of course, then she admitted that once HR figured out the issue, the employees were gone within five days. So it was just this litany of minor things throughout that I really think do not rise to the standard. Fundamentally, they started with the case... 2014 on the termination, but there's really no adverse action between them. The court presumed, the district court presumed that there was also an adverse action in 2012, when during the renovation, she had to go from five days a week to four days a week. Well, there are no rooms to clean at that point in time. There's not very much for housekeeping to do. And certainly, everybody else in the housekeeping department was laid off, but she was allowed to continue doing her job. Were there any other management level people laid off during that period? I don't believe so, Your Honor. I think it was just housekeeping. But if we're going down that path, one of the things the district court should have done was apply the statute of limitations to that. Then because for that alleged adverse action, it occurred in 2012. Into April of 2013? Through 2013. So at least as far as the MHRA, that would be untimely. On the question of causation and temporal proximity, the court here did not make temporal proximity a separate element to the claim. The court simply said that you don't have temporal proximity here. It's three years, but then you actually have to have evidence that there was intent to retaliate. And that's where the whole notion comes in of the honest belief of the employer here. And that is the information that was in front of the employer when they made the decision. And really, they relied so heavily on this notion of Rivers being the chess master behind the scenes that is making everything happen. Well, Rivers is gone. If you read their records, it's all about Rivers and how he was trying to get everybody to go after Ms. Nagib. But the record will show that Rivers completely disappeared from this case. So he's like this phantom in the background of the case who has nothing to do with the termination. The most they can point to is this take control email from 2013, which doesn't tell the new manager to take control. He just asks the question, is somebody taking control of Ms. Nagib? Now, Ms. Nagib testified that she was a strong personality. So of course, you would want to know, is the new general manager taking control of things, including of Ms. Nagib, who, based on the record, was a difficult employee? I see my time is up. But to the court, have any questions relating to any of the evidence? I don't see any. Okay. Thank you, Your Honor. We respectfully request that it be affirmed. Ms. Inkelmeyer, your rebuttal. Thank you, sir. First, I'd like to address the adverse employment action question that Judge Colleton addressed. It's not what the cases in federal court say about what is adverse employment action. It's what the Minnesota Whistleblower Act says. We submitted our 28J submission, noting that Friedlander has come down in between. The Whistleblower Act, on its face, says, as the amicus brief points out, the standard for adverse employment action is that which might dissuade a reasonable worker. This court did not apply that standard. Is it different, do you think, from Burlington Northern, or is it equivalent to Burlington? It's similar. There's one word different. Might instead of would. Might, I would argue, is slightly You said that Judge Erickson cited Burlington Northern. She certainly cited it. But if you read the opinion, she didn't apply it in any way. She didn't apply it at all. In fact, she made an affirmative statement that the only things, despite what Burlington said. Remember, in Burlington, the court said this person went out on a suspension and came back and got all their money back. And the court said that would dissuade a reasonable worker. But despite that language from Burlington, Judge Erickson specifically said the only things that are adverse employment action are taking away vacation, losing your job, or losing money. That's totally inconsistent with Burlington. So, although she gave lip service to Burlington, she didn't apply it. And similarly, if you look- What do you think is your best action beyond the ones that she recognized that would have chilled a reasonable person? Sure. I'm just going to switch to that part of my materials here. Sure. So, number one, I think this lawyer yelling at her, and that statute of limitations argument is not applicable at all because the court found specifically in footnote number, oh, shoot, I forgot the footnote. But in a footnote, she didn't decide the statute of limitations. So, the lawyer yells at her. That would dissuade a reasonable worker. Similarly, here's what happens with respect to vacation. So, this is right before she's fired. This is in June of 2014. Here's what happens, Your Honor. Number one, in June, she's told you can extend your vacation like every other year. She's been there 41 years. And then in July, she's told, no, you can't because we have a use it or lose it policy. She talks to somebody else in HR in August of 2014, and they tell her, oh, yeah, you can extend it to July. But despite those prior communications, on October 8th, she is directed by the person to whom she complained about discrimination and harassment that she must decide within the next eight days, despite the fact that their policy says you have to give two weeks' notice, that she must go out on vacation. So, finally, you know what, Your Honor? On the 20th of October, the record makes clear that she said, I will forfeit my vacation. And instead of letting her forfeit her vacation, they forced her to go and they brought in somebody to inspect her work area and cooked up a reason to fire her. The investigation itself is adverse employment action because just like this court found in Ritchie, I think it was written by you, Judge Colleton, you say that, you know, we're distinguishing Galluli because, remember, in Galluli, there was no independent verification or any question of that sort. So Galluli goes forward. Our case is like Galluli because in Ritchie, there was an independent investigation. And in the end of Ritchie, you said if there's inconsistencies, if there's arbitrary decisions, here there's inconsistencies, I beg of you to read the crane transcript before you decide this case. It is so clear that she was not asked the same questions as are in the supplemental appendix for everyone else. And it is so clear that she has a very serious language impediment. She kept saying, I do what I was told, I do what I was told, or words to that effect. And as this, as we pointed out on page 26 of our memorandum to this court, it matters if English is your second language. The way you say things is different. Because here's what we have in this case, Your Honor. Counsel, counsel, your time's expired. Oh, I apologize. Thank you. Thank you, Your Honor. All right. The court wishes to thank all counsel for your presence this morning and the argument you provided to the court. We'll take the case under advisement, render decision in due course. Thank you.